## THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

THOMAS GLASER and LYNN SAPYTA,

      Plaintiffs,

vs.

COLLEGE OF DUPAGE; JOSEPH COLLINS, in his individual and official capacities; and KATHARINE HAMILTON, in her individual and official capacities.

      Defendants.

Case No.: 15 CV 10765

**JURY TRIAL DEMANDED**

## COMPLAINT

    Plaintiffs THOMAS GLASER and LYNN SAPYTA, by and through their undersigned counsel, hereby submit this Complaint against Defendants COLLEGE OF DUPAGE; JOSEPH COLLINS, in his individual and official capacities; and KATHARINE HAMILTON, in her individual and official capacities, and allege as follows:

## INTRODUCTION

1. Plaintiffs bring this action to redress the violations by Defendants, acting under color of state law, of their constitutional and contractual rights. Plaintiffs were deprived of their constitutional and contractual rights when Defendants wrongfully terminated Plaintiffs' employment in violation of those legal rights and without due process. Defendants took these unlawful actions to retaliate against Plaintiffs: (a) for exercising their First Amendment rights of free speech and free association by, *inter alia*, failing to support and/or opposing Defendant Katharine Hamilton's political agenda, including her handpicked candidates that she supported for election

to the College of DuPage Board of Trustees; (b) for exercising their First Amendment rights of free speech and free association by, *inter alia*, failing to support and/or opposing and/or campaigning against those political candidates; and/or (c) because Defendants perceived Plaintiffs as, *inter alia*, being associated with the Democratic Party and/or supporting Hamilton's political opponents on the College of DuPage Board of Trustees and/or opposing Hamilton's handpicked candidates that she supported for election to the College of DuPage Board of Trustees and/or opposing Hamilton's political agenda and/or opposing Hamilton's political allies on the College of DuPage Board of Trustees.

2.   In unlawfully terminating Plaintiffs, Defendants retaliated against them in violation of their First Amendment rights (Counts I & II), deprived Plaintiffs of their property and liberty interests without due process of law in violation of the Fourteenth Amendment (Count III & IV), breached Plaintiffs' employment contracts (Count V & VI), and conspired against Plaintiffs to do all of the above (Count VII).

## JURISDICTION AND VENUE

3.   This Court has jurisdiction over Counts I through IV pursuant to 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331 and 1343.  This Court has jurisdiction over Counts V through VII pursuant to the Court's supplemental jurisdiction, as codified in 28 U.S.C. §1367(a).

4.   Venue is proper in this judicial district under 28 U.S.C. §1391(b) and (c) because the Plaintiffs and all of the Defendants either reside in this district or have their principal place of business in this district, and all events giving rise to Plaintiffs' claims occurred within this district.

## PARTIES

5.   Plaintiff THOMAS GLASER ("Glaser"), an individual, is a resident of Cook County. Between 2009 and 2011, Glaser was first the Assistant Vice President, and then the Vice President of Administrative Affairs and Treasurer for the College of DuPage.  At all relevant times thereafter, Glaser served as the Senior Vice President of Administration and Treasurer at the College of DuPage.

6.   Plaintiff LYNN SAPYTA ("Sapyta"), an individual, is a resident of DuPage County.  At all times relevant hereto, Sapyta was the Assistant Vice President of Financial Affairs and Controller for the College of DuPage.

7.   Defendant COLLEGE OF DUPAGE ("COD" or "College") is a community college located in Glen Ellyn, Illinois.  It is a local public entity organized under the Public Community College Act, 110 ILCS 805 et seq.  The College was created by local referendum and is funded by a number of sources, including local property taxes.  It is governed by a locally elected seven-member Board of Trustees ("COD Board") and one elected, non-voting student representative.

8.   Defendant KATHARINE HAMILTON ("Hamilton"), named in her official and individual capacities, is a resident of the Village of Hinsdale, Illinois, and currently serves as Chair of the COD Board.  Hamilton used her position as Chair of the COD Board and leader of the current COD Board majority to, *inter alia*, create policy for COD, including directing Defendant Joseph Collins to unlawfully terminate Plaintiffs and then approving those terminations.

9.   Defendant JOSEPH COLLINS ("Collins"), named in his official and individual capacities, is the Acting Interim President of the College.  The COD Board appointed Collins to this position on April 30, 2015.  Collins, at the direction of and/or in concert with Defendant Hamilton and Defendant COD, unlawfully terminated Plaintiffs.

10. At all times material hereto, each Defendant acted under color of state law within the meaning of 42 U.S.C. § 1983.

## FACTS UPON WHICH CLAIMS ARE BASED

### A. Plaintiffs' Appointments

11. At the end of 2008, COD was in disarray. Presidents were coming and going, and the College was saddled with debt. At the same time, COD's accounting and control systems had become antiquated and had been mismanaged. In May 2008, the COD Board terminated COD President Sunil Chand, asked former COD President Harold McAninch to return to serve on an interim basis, and determined that a financial turn-around team with substantial civil service experience needed to be hired.

12. At that time, the COD Board's first step to turn around the College was to hire Dr. Robert Breuder ("Breuder") to be its President. Breuder had over 25 years of experience in successfully heading colleges such as COD.

13. As President, Breuder was responsible for recommending actions and/or proposing policies to the COD Board and for implementing procedures in support of those actions and/or policies once approved by the COD Board. Coming to COD with an aggressive turn-around agenda, Breuder recommended various actions and policies to the COD Board to increase enrollment, expand the College's academic programs, make dramatic additions and renovations to the campus, and significantly reduce unneeded spending.

14. Toward that end, Breuder recommended that the COD Board appoint administrators who had distinguished careers in public-sector finance. He recommended Glaser for Assistant Vice President of Administrative Affairs. At that time, Glaser had extensive experience in public-sector finance. The COD Board voted unanimously to appoint Glaser to the position of Assistant

4

Vice President of Administrative Affairs in April 2009. Subsequently, the COD Board voted to promote Glaser to Vice President, and then, in 2011, to Senior Vice President of Administration and Treasurer. Per his job description and the duties that he actually performed while at COD, Glaser was an administrator who reported to the College President and had no policymaking authority.

15. After Glaser was hired, the College ran a search for replacement candidates for its Controller. Based on her extensive high-level experience in both the public and private finance fields, Glaser recommended Sapyta to Breuder for the Controller position from among those who applied. In June 2010, per Breuder's recommendation, the COD Board voted unanimously to appoint Sapyta to the position of Assistant Vice President of Financial Affairs and Controller. Per her job description and the duties that she actually performed while at COD, Sapyta was an administrator who reported to Glaser and had no policymaking authority.

16. The COD Board neither made Glaser nor Sapyta's political affiliations a prerequisite for, or even a consideration in, deciding to hire them into their administrative positions at COD.

### B. Plaintiffs' Performances at COD – 2009 to 2015

17. At the time Glaser and Sapyta arrived at COD, they discovered administrative and financial systems that were antiquated, inadequate, and mismanaged. To name just a few examples, the Accounts Receivable subsidiary ledger was out of balance with the general ledger by more than $4 million, and no one could explain the discrepancy; invoicing for receivables was more than a year behind; the bank reconciliation had not been done for over a year and was out of balance with the general ledger by $7 million; due to poor management of student receivables, the reserve for bad debts needed to be increased by $5 million; financial statements were generated manually rather than automatically; monthly budget-to-actual financial reviews were

nonexistent; IRS quarterly reporting was behind and the College was accruing penalties; the College had and was continuing to improperly calculate Medicare, FICA, and SURS deductions; and investments and collateral were not being properly tracked.

18. In an attempt to cure these and other irregularities, Glaser worked with Sapyta to help overhaul COD's financial management tools to make them consistent with prudent public sector financial norms, including among other things:

    a. Following best practices that resulted in designation of specific reserves to fund: 1) potential pension liabilities; 2) the College's Information Technology Strategic Plan; 3) facilities maintenance; 4) the College's retiree health care responsibilities; 5) construction of a new teaching and learning center; and 6) the College's financial obligations for potential required Capital Development Board funding;

    b. Strengthening the treasury management function by creating a weekly investment report that tracked investment returns and collaterization;

    c. Developing monthly cash flow reports and forecasting to facilitate durations of investments;

    d. Employing best practices financial models to forecast College financial results for the annual budget and monthly projections of college operations;

    e. Distributing a monthly economic indicator report to all college administrators to make them aware of key economic indicators that affect the college and economy;

    f. Streamlining College Budget and financial planning processes, thus curbing unrealistic department budget inflation;

    g. Retaining outside financial expert firms, which resulted in, among other things, the refinancing of portions of the College's outstanding bonds, thus saving the College

and district taxpayers almost $1 million;

h.  Bringing management of student payment plans in house to achieve cost savings and revenue enhancements;

i.  Bringing management of construction and major renovation projects in house to obtain cost savings in excess of $500,000;

j.  Improving internal accounting controls by, among other things, having reconciliations for every balance sheet account prepared monthly, reconciling all subsidiary ledgers to the general ledger, employing best practices procedures to reconcile all credit card transactions, developing over 50 automated financial statements so that College management could effectively monitor operations and understand the seasonality trends of revenues and expenses, developing and documenting process flow charts for major processes and activities and reviewing internal controls of these activities and documenting over 40 procedures for accounting tasks such as how to prepare the annual tax levy;

k.  Preparing, or having prepared, monthly analyses of departments and funds and tracking key revenue and expense accounts;

l.  Purchasing best practices software systems for essential budgeting, electronic invoicing, document management, student payment plans, and employee reimbursements to improve processes and internal controls;

m.  Enrolling COD in the State of Illinois Local Debt Recovery Program that resulted in collections of past due receivables of approximately $500,000;

n.  Drafting procedure manuals for Payroll, Accounts Payable, General Accounting, Accounts Receivables, Budget, Financial Aid, and Grant Accounting.

7

19. As a direct result of Glaser and Sapyta's work on improving COD's financial management tools, the College's finances and operations improved significantly, including as follows:

    a. COD was able to propose and get passed a $168 million capital referendum that enabled COD to complete renovations and new construction to enhance and modernize the campus;

    b. The College's fund balance more than tripled from under $60 million to approximately $200 million during the worst recession since the Great Depression;

    c. COD was able to complete an approximately $550 million campus improvement program, which added nearly 1.5 million square feet of enhanced and modernized educational space;

    d. The College consistently received the Distinguished Budget Presentation Award and the Certificate of Achievement for Excellence in Financial Reporting from the Government Finance Officers Association;

    e. The College maintained its Aaa and AAA bond ratings, respectively, from Moody's Investor Services and Standard & Poor's; and,

    f. For each fiscal year from 2009 through 2015, the College received unqualified/unmodified audit opinions, with no material weaknesses or significant deficiencies, from its external auditor, Crowe Horwath LLP.

20. Based upon the above stated facts, as well as other facts, both Glaser and Sapyta received superior annual performance reviews, of which the COD Board was made aware and to which it had access.

### C. Extension of Plaintiffs' Employment Contracts

21. Given their superior performances, as noted above in part, the COD Board renewed and

8

extended Plaintiffs' employment contracts multiples times. This occurred most recently on February 19, 2015, when the COD Board voted to extend Plaintiffs' employment contracts to June 30, 2017. A true and correct copy of Glaser's Notice of Re-Appointment is attached to this Complaint as "Exhibit A" and is incorporated here by reference. A true and correct copy of Sapyta's Notice of Re-Appointment is attached to this Complaint as "Exhibit B" and is incorporated here by reference.

22. The binding contractual agreement between Glaser and COD, which was executed on April 25, 2009, stipulated that Glaser's employment could be terminated only for cause. A true and correct copy of Glaser's employment contract is attached to this Complaint as "Exhibit C" and is incorporated here by reference.

23. The binding contractual agreement between Sapyta and COD, which was executed on July 1, 2010, also stipulated that Sapyta's employment could be terminated only for cause. A true and correct copy of Sapyta's employment contract is attached to this Complaint as "Exhibit D" and is incorporated here by reference.

24. Plaintiffs' employment contracts, as extended on February 19, 2015, conferred and established in Plaintiffs a property interest in their continued employment as Senior Vice President of Administration and Treasurer, and Assistant Vice President of Financial Affairs and Controller, respectively. Thus, the College could not terminate Plaintiffs' employment without due process or in contravention of the terms of their employment contracts.

25. Under COD Board policy, absent various reasons such as death, disability, resignation, or separation by mutual agreement, Plaintiffs contracts could only be terminated "for cause."

### D. Plaintiffs' Protected Political Activities

26. Between April 2013 and May 2015, Plaintiffs engaged in multiple political activities

protected under the First Amendment, including but not limited to:

    a.  Refusing to support and/or opposing Defendant Hamilton's political/personal agenda at COD;

    b.  Failing to support and/or opposing and/or campaigning against Hamilton's handpicked candidates for trustees of the COD Board in the 2015 election by, among other things:

        i.  Attending campaign events and speaking out against Hamilton's agenda;

        ii.  Putting up yard signs for candidates who were running against Hamilton's handpicked candidates for trustees of the COD Board in the 2015 election;

        iii.  Contributing to candidates who did not support Hamilton; and

        iv.  Speaking out publicly against and organizing opposition to Hamilton's handpicked candidates and proposed "reform policies."

### E. Defendant Hamilton's Political Animus Toward Plaintiffs

27. Between April 2013 and May 2015, Defendant Hamilton developed a political animus against Plaintiffs because (a) Plaintiffs failed to support Hamilton's political agenda for COD which she was pursuing, in significant part, to further her own political career; (b) Plaintiffs failed to support, opposed, and/or campaigned against Hamilton's handpicked candidates for trustees of the COD Board in the 2015 election, including by attending campaign events and speaking out against Hamilton's agenda, putting up yard signs for candidates who were running against Hamilton's handpicked candidates for trustees of the COD Board in the 2015 election, contributing to candidates who did not support Hamilton, and speaking out publicly against and organizing opposition to Hamilton's handpicked candidates; and/or (c) Hamilton perceived that Plaintiffs opposed her political agenda at COD and her handpicked candidates in the 2015 COD

Board of Trustees election and/or were Democrats who opposed her political beliefs and/or principles and/or the political party with whom she and her political allies on the COD Board and elsewhere were associated.

28. Hamilton reflected her belief and/or her perception that Plaintiffs were her political opponents, and demonstrated her political animus against them in multiple ways, including the following:

a. On various occasions, Hamilton, directly and/or indirectly through her paid political consultant, Christopher Robling ("Robling"), and others both known and unknown to Plaintiffs, accused Plaintiffs of being "Cook County Democrats" who were political hacks not working in the best interests of COD and/or DuPage County taxpayers;

b. Supported, endorsed, or, on information and belief, directed Robling to publish an article labeling Glaser and Sapyta as "two key Democrats" who would remain in their administrative positions at COD if Hamilton's handpicked slate of candidates in the April 2015 COD Board elections failed to win;

c. Repeatedly attacked Plaintiffs as "Cook County" and "CTA" "Democrats who brought improper tax and spending standards to COD";

d. Asserted directly and/or through others, including Robling, that DuPage Republicans who voted against her handpicked slate of candidates for the COD Board in the April 2015 election would be "endorsing the work of John Stroger's CFO [Glaser] and the CTA's longtime treasurer [Sapyta]"; and,

e. Loudly reprimanded Sapyta at a public meeting after Sapyta provided accurate information about certain aspects of COD's finances in response to an inquiry made to Sapyta at that meeting which Hamilton overheard, including by hurling various

insults toward Sapyta and shouting "you should be in jail."

### F. Post-Election Efforts to Ensure Plaintiffs' Unlawful Termination

29. On April 7, 2015, an election was held and all three of Hamilton's handpicked candidates were elected as trustees and thus, with Hamilton, constituted the new majority on the COD Board. Once seated, the new majority selected Hamilton to be COD Board Chair. As the new COD Board majority, Hamilton and her handpicked, newly-elected COD trustees now had the ability to direct the College's employment decisions.

30. Immediately thereafter, Hamilton issued a Legal Hold notice to COD, stating: "Finally I am advising you that there is a high likelihood that litigation will be initiated against certain COD employees and administrators relating to the execution of their job duties…"

31. Thereafter, Defendants began to take steps to wrongfully terminate Plaintiffs' employment because Plaintiffs: a) had failed to support and/or opposed Hamilton's political/personal agenda at COD; and/or b) had failed to support and/or opposed and/or campaigned against Hamilton's handpicked candidates for trustees of the COD Board in the 2015 election; and/or c) were perceived by Defendants to have opposed Hamilton's political/personal agenda at COD and her handpicked candidates in the 2015 COD Board election and/or to be Democrats who opposed her and her political allies', on the COD Board and elsewhere, political beliefs, principles and/or the political party with whom they were associated and/or identified. These steps included the following:

 a. Hamilton, directly and through her newly-elected political allies on the COD Board, appointed her political supporter, Defendant Collins, to the position of Acting Interim President. Defendant Collins, in turn, agreed to terminate both Plaintiffs to support Hamilton;

b. Hamilton, directly and through her newly-elected political allies on the COD Board, had COD retain her personal attorney, Dan Kinsella ("Kinsella") of Schuyler, Roche & Crisham, to carry out an investigation into Plaintiffs' employment history in order to create a justification for COD's unlawful termination of them;

c. Toward that same end, on about May 13, 2015, prior to any investigation into Glaser's performance and without any knowledge of sufficient facts which could support the "cause" required under Glaser's contract to allow his lawful termination, Hamilton stated to Collins "we're going to fire Glaser anyway."

d. At Hamilton's and the COD Board's direction, Kinsella and/or lawyers at his firm requested copies of Plaintiffs' employment contracts to ascertain what was required to terminate them and then drafted a series of alleged charges on which to base Defendants' prior desire to place both Plaintiffs on administrative leave and ultimately terminate them; and,

e. Hamilton directed Collins to hire her political advisor, the aforementioned Robling, in a newly-created position of Assistant to the President for Institutional and Transitional Affairs, in order to, among other things, allow Robling to provide misleading statements about Plaintiffs to, among others, the media, to generate support for her planned unlawful termination of them. At Hamilton's direction, Collins then hired Robling.

32. On June 8, 2015, Glaser was summoned to a four-hour interview attended by multiple legal and accounting professionals retained by COD at Hamilton's direction, including Kinsella.

33. Subsequently, Sapyta was also summoned to a three-hour interview with those same legal and accounting professionals, including Kinsella.

34. The following day, Glaser and Sapyta were placed on administrative leave "pending completion of an investigation." The letter provided no explanation of why they were under investigation.

35. On the same day, COD issued a news release announcing that Glaser and Sapyta had been placed on administrative leave "pending the final results of an ongoing investigation." The release falsely reported, among other things, that Glaser and Sapyta increased the College's IMET investment "without Board authorization or endorsement" and that they "failed to reply to any recommendations made by Martner."

### G. *Defendants Unlawfully Terminate Plaintiffs*

#### i.     *Glaser*

36. On September 9, 2015, Defendants, acting individually and in concert with each other, unlawfully terminated Glaser for alleged "cause," when in fact a substantial or motivating factor in Defendants' decision to terminate Glaser was his exercise of his First Amendment rights as alleged in Paragraphs 26, 26(a)-(b), and 26(b)(i)-(iv) herein, and/or Defendants' perception that Glaser had exercised these rights as further alleged in Paragraphs 27-28 herein.

37. Specifically, through Defendant Collins, Defendants issued a termination notice to Glaser that listed twenty-six (26) separate allegations of purported misconduct justifying his termination, when in fact Defendants knew such allegations:

  a.  Were false; and/or

  b.  Were insufficient to justify a "for cause" termination because the conduct alleged had been approved and/or otherwise authorized by the COD Board, including specifically Defendant Hamilton;

  c.  Were insufficient to justify a "for cause" termination because other COD employees

who were not viewed as Hamilton's political opponents had engaged in the same

and/or comparable conduct without any punishment let alone termination;

d. Were insufficient to justify a "for cause" termination because Defendant Collins and

Defendant Hamilton engaged in worse conduct than that alleged against Glaser and

not only suffered no punishment but, in Collins' case, received a promotion to

"Acting Interim President" of the College;

e. Constituted either an isolated incident and/or had no adverse impact on the College

and thus were insufficient to justify a "for cause" termination, especially when

viewed in the light of Glaser's long, superior performance at COD; and/or

f. Were a mere pretext to mask the fact that Glaser's exercise of his First Amendment

rights as alleged in Paragraphs 26, 26(a)-(b), and 26(b)(i)-(iv), and/or Defendants'

perception that Glaser exercised his First Amendment rights as alleged in Paragraphs

27-28 herein, were substantial or motivating factors in their decision to terminate him.

("Glaser's Termination Notice"). A true and correct copy of Glaser's Termination Notice is

attached to this Complaint as "Exhibit E" and is incorporated here by reference.

38. The allegations in Glaser's Termination Notice were designed to mask the fact that a

substantial or motivating factor in terminating Glaser was his exercise of, and/or Defendants'

perception of his exercise of, his First Amendment rights as alleged in Paragraphs 26-28 herein,

as evidenced by, among other things:

a. They were false; and/or

b. They were insufficient to justify a "for cause" termination;

c. The number of allegations – twenty-six – were employed specifically to mask the

falsity and/or "for cause" insufficiency of any one and/or all of them and in turn

15

wrongly justify a "for cause" termination;

d. They were made shortly after the April 2015 COD Board of Trustee's election in which Glaser failed to support and/or opposed and/or campaigned against and/or was perceived by Defendants to have opposed Hamilton's handpicked slate of trustee candidates and after Hamilton repeatedly characterized Glaser as, *inter alia,* a "Democrat" trying to bring "John Stroger" and/or Cook County Democratic policies which "DuPage Republicans" needed to vote against;

e. The allegations were initially made in June 2015, before any legitimate investigation into them had occurred;

f. They were made after Defendant Hamilton had already decided, in May 2015, to terminate Glaser for his political opposition and/or his perceived political opposition to Hamilton and/or her handpicked slate of candidates for the COD Board; and/or

g. For the reasons set forth in Paragraphs 37(a)-(f) herein.

### ii. *Sapyta*

39. On September 9, 2015, Defendants, acting individually and in concert with each other, unlawfully terminated Sapyta for alleged "cause," when in fact a substantial or motivating factor in Defendants' decision to terminate Sapyta was her exercise of her First Amendment rights as alleged in Paragraphs 26, 26(a)-(b), and 26(b)(i)-(iv) herein, and/or Defendants' perception that Sapyta had exercised these rights as further alleged in Paragraphs 27-28 herein.

40. Specifically, through Defendant Collins, Defendants issued a termination notice to Sapyta that listed eleven (11) separate allegations of purported misconduct justifying her termination, when in fact Defendants knew such allegations:

a. Were false; and/or

b.  Were insufficient to justify a "for cause" termination because the conduct alleged had been approved and/or otherwise authorized by the COD Board, including specifically Defendant Hamilton;

c.  Were insufficient to justify a "for cause" termination because other COD employees who were not viewed as Hamilton's political opponents had engaged in the same and/or comparable conduct without any punishment let alone termination;

d.  Were insufficient to justify a "for cause" termination because Defendant Collins and Defendant Hamilton engaged in worse conduct than that alleged against Sapyta and not only suffered no punishment but, in Collins' case, received a promotion to "Acting Interim President" of the College;

e.  Constituted either an isolated incident and/or had no adverse impact on the College and thus were insufficient to justify a "for cause" termination, especially when viewed in the light of Sapyta's long, superior performance at COD; and/or,

f.  Were a mere pretext to mask the fact that Sapyta's exercise of her First Amendment rights as alleged in Paragraphs 26, 26(a)-(b), and 26(b)(i)-(iv), and/or Defendants' perception that Sapyta exercised her First Amendment rights as alleged in Paragraphs 27-28 herein, were substantial or motivating factors in their decision to terminate her.

("Sapyta's Termination Notice").  A true and correct copy of Sapyta's Termination Notice is attached to this Complaint as "Exhibit F" and is incorporated here by reference.

41. The allegations in Sapyta's Termination Notice were designed to mask the fact that a substantial or motivating factor in terminating Sapyta was her exercise of, and/or Defendants' perception of her exercise of, her First Amendment rights as alleged in Paragraphs 26-28 herein, as evidenced by, among other things:

a. They were false; and/or

b. They were insufficient to justify a "for cause" termination;

c. The number of allegations – eleven – were employed specifically to mask the falsity and/or "for cause" insufficiency of any one and/or all of and in turn wrongly justify a "for cause" termination;

d. They were made shortly after the April 2015 COD Board of Trustee's election in which Sapyta failed to support and/or opposed and/or campaigned against and/or was perceived by Defendants to have opposed Hamilton's handpicked slate of trustee candidates and after Hamilton repeatedly characterized Sapyta as, *inter alia*, a "Democrat" trying to bring "CTA" and/or Cook County Democratic policies which "DuPage Republicans" needed to vote against;

e. The allegations were initially made in June 2015, before any legitimate investigation into them had occurred;

f. They were made after Defendant Hamilton had already decided, in May 2015, to terminate Sapyta for her political opposition and/or her perceived political opposition to Hamilton and/or her handpicked slate of candidates for the COD Board; and/or

g. For the reasons set forth in Paragraphs 40(a)-(f) herein.

### H.  Defendants' Constitutionally Infirm Termination Process

42. Defendants, individually and acting in concert with each other, as well as others, used an unfair and biased termination process that deprived Plaintiffs of their constitutionally-protected due process rights, including the right to be heard at a meaningful time in a meaningful way prior to being denied their property right of continued employment at COD.

43. Defendants' termination process and procedures deprived Plaintiffs of their constitutional

right to due process in multiple ways, including the following:

a. Defendants pre-determined to terminate Plaintiffs before they began their termination process and thus failed to provide Plaintiffs with a fair opportunity to be heard and/or to preserve their employment through a full and fair hearing on the allegations on which their proposed terminations were being based;

b. Defendants' notices of proposed termination, issued to Plaintiffs in June 2015, contained multiple vague allegations and failed to identify or provide an explanation of the evidence supposedly supporting those allegations, thus precluding Plaintiffs from being allowed to fairly respond to them;

c. Defendants' conducted pre-termination hearings for both Plaintiffs run by Defendant Hamilton's personal attorney, Kinsella, and a lawyer at Kinsella's law firm, in a manner wholly inconsistent with all such prior hearings at COD and with no consideration of the merits of any of Plaintiffs' responses to the allegations on which their proposed terminations were based;

d. Defendant Collins presided over Plaintiffs' pre-termination hearings in a manner wholly inconsistent with all such prior pre-termination hearings at COD and designed not to evaluate the merits of any of Plaintiffs responses to the allegations on which their proposed termination were based because he had already decided to terminate them regardless of their responses; and

e. Defendant Hamilton, and the COD Board majority whom Hamilton had vociferously supported and provided extensive financial support for in the 2015 COD Board elections, refused to delegate the ultimate decision on whether there was "cause" to terminate Plaintiffs to an independent arbitrator because they had already decided to

terminate Plaintiffs.

44. In sum, Defendants' entire termination process - from the time they put Plaintiffs on administrative leave through the time Defendants issued the termination notices to Plaintiffs - was a mere sham that failed to offer Plaintiffs a timely and meaningful opportunity to challenge their terminations and thus deprived Plaintiffs of their property and liberty interests without due process of law.

### I. Defendants' Unconstitutional Deprivation of Plaintiffs' Liberty Interests

45. Beginning in April 2015 and continuing to the present, Defendants, acting individually or in concert with each other and others known and unknown to Plaintiffs, publicly stigmatized Plaintiffs and impugned their personal and professional reputations, character, and integrity by widely disseminating false, unfounded, and/or highly damaging statements about purported unprofessionalism and unethical conduct by Plaintiffs and about the purported reasons for their terminations, including but not limited to:

a. Defendant Hamilton worked with her political advisor, Robling, to use hyperbole, misleading statements, and outright falsehoods to publicize her self-proclaimed reform agenda at the expense of Plaintiffs by falsely labeling them as Cook County Democratic hacks loyal only to tax-and-spend government and not the tax payers' best interests;

b. On June 9, 2015, COD issued a press release announcing that Plaintiffs had been placed on administrative leave "pending the final results of an ongoing investigation." The release falsely reported, among other things, that Glaser increased the College's IMET investment "without Board authorization or endorsement;"

c. Defendants issued termination notices which contained false and/or misleading

allegations, which they then released to media outlets with the intent that they receive the maximum media exposure possible; and

d. As Defendants planned, the termination notices' false and misleading allegations received wide publicity and adverse editorial comment in the media, and severely damaged Plaintiffs' reputations for honesty and integrity.

46. Defendants' decision to widely publicize, *inter alia,* the false and misleading claims set forth in Paragraphs 45 and 45(a)-(d), have had a devastating impact on Plaintiffs' reputations and rendered them currently unemployable in their chosen fields.

## COUNT I
### (§ 1983 Violation of Glaser's First Amendment Rights – Political Retaliation Against All Defendants)

47. Plaintiff Glaser restates and realleges by reference paragraphs 1 through 46 as if fully set forth herein against all Defendants.

48. The First Amendment protects a wide spectrum of free speech and association, including a public employee's right to free association and to support or not support a political candidate of their own choosing.

49. By, *inter alia*, failing to support, opposing, and/or campaigning against Hamilton's political agenda at COD and/or handpicked candidates for the 2015 COD Board of Trustees election, and/or by his actual or perceived political affiliation and/or association with Hamilton's political opponents, Glaser was engaged in the exercise of his rights under the First Amendment.

50. Glaser's exercise of his First Amendment rights was a substantial or motivating factor in Defendants' decisions to cause and/or approve Glaser's termination.

51. Each and all Defendants intentionally subjected Plaintiff to unequal and retaliatory treatment by subjecting Plaintiff to false allegations and termination.

21

52. The actions of each and all Defendants against Glaser violated his rights guaranteed under the First Amendment to the United States Constitution and 42 U.S.C. § 1983.

53. The actions of each and all Defendants were intentional, willful, and malicious and/or in reckless disregard of Glaser's rights as secured by the First Amendment and 42 U.S.C. § 1983. Glaser therefore seeks awards of punitive damages against these Defendants in order to deter them from such wrongful conduct in the future.

54. The acts of each and all Defendants have caused Glaser great mental anguish, humiliation, degradation, physical and emotional pain and suffering, inconvenience, lost wages and benefits, future pecuniary losses, and other consequential damages.

### COUNT II
### (§ 1983 Violation of Sapyta's First Amendment Rights – Political Retaliation Against All Defendants)

55. Plaintiff Sapyta restates and realleges by reference paragraphs 1 through 46 as if fully set forth herein against all Defendants.

56. The First Amendment protects a wide spectrum of free speech and association, including a public employee's right to free association and to support or not support a political candidate of their own choosing.

57. By, *inter alia*, failing to support, opposing, and/or campaigning against Hamilton's political agenda at COD and/or handpicked candidates for the 2015 COD Board of Trustees election, and/or by her actual or perceived political affiliation and/or association with Hamilton's political opponents, Sapyta was engaged in the exercise of her rights under the First Amendment.

58. Sapyta's exercise of her First Amendment rights was a substantial or motivating factor in Defendants' decisions to cause and/or approve Sapyta's termination.

59. Each and all Defendants intentionally subjected Sapyta to unequal and retaliatory treatment

by subjecting Sapyta to false allegations and termination.

60. The actions of each and all Defendants against Sapyta violated her rights guaranteed under the First Amendment to the United States Constitution and 42 U.S.C. § 1983.

61. The actions of each and all Defendants were intentional, willful, and malicious and/or in reckless disregard of Sapyta's rights as secured by the First Amendment and 42 U.S.C. § 1983. Sapyta therefore seeks awards of punitive damages against these Defendants in order to deter them from such wrongful conduct in the future.

62. The acts of each and all Defendants have caused Sapyta great mental anguish, humiliation, degradation, physical and emotional pain and suffering, inconvenience, lost wages and benefits, future pecuniary losses, and other consequential damages.

## COUNT III
### (§ 1983 Violation of Glaser's Right to Procedural Due Process Against All Defendants)

63. Plaintiff Glaser restates and realleges by reference paragraphs 1 through 46 as if fully set forth herein against all Defendants.

64. Glaser held a constitutionally-protected property interest in continued employment as Senior Vice President of Administration of COD. His property interest arose from the contractually-binding promise made by COD that Glaser would not be deprived of his position except for cause, as set forth in Policy No. 15-275.

65. Defendants deprived Glaser of his property interest in continued employment by causing and/or approving his termination.

66. Glaser also held a constitutionally-protected liberty interest in his ability to continue seeking and obtaining future employment in the profession to which he has devoted his working life and in which he has invested substantial time, resources, and efforts to gain the education, training, and experience needed to succeed.

67. Defendants deprived Glaser of his liberty interest by, *inter alia,* causing and/or approving his termination, and by, *inter alia*, repeatedly disseminating false, unfounded, and highly damaging statements about the purported reasons for his termination.  In doing so, Defendants publicly stigmatized Glaser and impugned his personal and professional reputation in a manner that has caused Glaser to lose other tangible employment opportunities and made it virtually impossible for Glaser to find employment in his field.

68. By engaging in the conduct alleged herein, including but not limited to: 1) failing to provide Glaser adequate notice of the charges against him; 2) concluding, without a legitimate investigation, that Glaser engaged in the misconduct alleged; 3) providing an inadequate and biased pre-termination process; 4) denying Glaser a full and fair opportunity to be heard after his termination; and 5) refusing to delegate decision-making authority to an independent arbitrator to determine if there was "cause" to terminate Glaser, Defendants unlawfully deprived Glaser of his constitutionally-protected property and liberty interests without procedural due process in violation of his rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

69. The actions of each and all Defendants were intentional, willful, and malicious and/or in reckless disregard of Glaser's rights as secured by the Fourteenth Amendment and 42 U.S.C. § 1983.  Glaser therefore seeks awards of punitive damages against these Defendants in order to deter them from such wrongful conduct in the future.

70. The actions of each and all Defendants have caused Glaser substantial damages, including but not limited to loss of employment, loss of past and future income and benefits, loss of earning capacity, emotional distress, loss of reputation, and humiliation and embarrassment. Glaser will continue to suffer these damages in the future.

## <u>COUNT IV</u>
### (§ 1983 Violation of Sapyta's Right to Procedural Due Process Against All Defendants)

71. Plaintiff Sapyta restates and realleges by reference paragraphs 1 through 46 as if fully set forth herein against all Defendants.

72. Sapyta held a constitutionally-protected property interest in continued employment as Assistant Vice President of Financial Affairs and Controller of COD.  Her property interest arose from the contractually-binding promise made by COD that Sapyta would not be deprived of her position except for cause, as set forth in Policy No. 15-275.

73. Defendants deprived Sapyta of her property interest in continued employment by causing and/or approving her termination.

74. Sapyta also held a constitutionally-protected liberty interest in her ability to continue seeking and obtaining future employment in the profession to which she has devoted her working life and in which she has invested substantial time, resources, and efforts to gain the education, training, and experience needed to succeed.

75. Defendants deprived Sapyta of her liberty interest by causing and/or approving her termination, and by, *inter alia*, repeatedly disseminating false, unfounded, and highly damaging statements about the purported reasons for her termination.  In doing so, Defendants publicly stigmatized Sapyta and impugned her personal and professional reputation in a manner that has caused Sapyta to lose other tangible employment opportunities and made it virtually impossible for Sapyta to find employment in her field.

76. By engaging in the conduct described in the preceding paragraphs, including but not limited to: 1) failing to provide Sapyta adequate notice of the charges against her; 2) concluding, without a legitimate investigation, that Sapyta engaged in the misconduct alleged; 3) providing an inadequate and biased pre-termination process; 4) denying Sapyta a full and fair opportunity to

be heard after her termination; and 5) refusing to delegate decision-making authority to an independent arbitrator to determine if there was "cause" to terminate Sapyta, Defendants unlawfully deprived Sapyta of her constitutionally-protected property and liberty interests without procedural due process in violation of her rights under the Due Process Clause of the Fourteenth Amendment to the United States Constitution and 42 U.S.C. § 1983.

77. The actions of each and all Defendants were intentional, willful, and malicious and/or in reckless disregard of Sapyta's rights as secured by the Fourteenth Amendment and 42 U.S.C. § 1983. Sapyta therefore seeks awards of punitive damages against these Defendants in order to deter them from such wrongful conduct in the future.

78. The actions of each and all Defendants have caused Sapyta substantial damages, including but not limited to loss of employment, loss of past and future income and benefits, loss of earning capacity, emotional distress, loss of reputation, and humiliation and embarrassment. Sapyta will continue to suffer these damages in the future.

### COUNT V
### (Breach of Glaser's Employment Contract Against Defendant College of DuPage)

79. Plaintiff Glaser restates and realleges by reference paragraphs 1 through 78 as if fully set forth herein against all Defendants.

80. Glaser formed a contract with Defendant COD by accepting an offer of employment on April 25, 2009. Glaser's contract was renewed by the COD Board multiple times, including on February 19, 2015, when the COD Board extended Glaser's appointment to June 30, 2017.

81. Pursuant to the contract, Defendant COD agreed that Glaser's employment could only be terminated for cause, as set forth in Policy No. 15-275.

82. Glaser substantially performed all of the contractual obligations that were required of him up to the time of Defendant COD's breach.

83. Defendant COD breached the contract by terminating Glaser's employment without cause.

84. Glaser suffered damages as a result of this breach, in an amount to be proved at trial, including lost wages and benefits.

## COUNT VI
### (Breach of Sapyta's Employment Contract Against College of DuPage)

85. Plaintiff Sapyta restates and realleges by reference paragraphs 1 through 78 as if fully set forth herein against all Defendants.

86. Sapyta formed a contract with Defendant COD by accepting an offer of employment on July 1, 2010. Sapyta's contract was renewed by the COD Board multiple times, including on February 19, 2015, when the COD Board extended Sapyta's appointment to June 30, 2017.

87. Pursuant to the contract, Defendant COD agreed that Sapyta's employment could only be terminated for cause, as set forth in Policy No. 15-275.

88. Sapyta substantially performed all of the contractual obligations that were required of her up to the time of Defendant COD's breach.

89. Defendant COD breached the contract by terminating Sapyta's employment without cause.

90. Sapyta suffered damages as a result of this breach, in an amount to be proved at trial, including lost wages and benefits.

## COUNT VII
### (Conspiracy Against All Defendants)

91. Plaintiffs repeat and reallege all of the paragraphs in this complaint as if fully set forth herein against all Defendants.

92. All of the Defendants and other co-conspirators, known and not yet known to Plaintiffs, reached an agreement amongst themselves to terminate Plaintiffs' employment, all in violation of Plaintiffs' constitutional and contractual rights, as described above.

93. In this manner, the Defendants, acting in concert with other known and unknown co-conspirators, conspired to accomplish an unlawful purpose by an unlawful means.

94. In furtherance of the conspiracy, each of the co-conspirators committed overt acts and was an otherwise willful participant in joint activity.

95. The misconduct described in this Count was objectively unreasonable and was undertaken intentionally with willful indifference to Plaintiffs' constitutional rights. Plaintiffs therefore seek awards of punitive damages against all of the Defendants and other co-conspirators, known and not yet known to Plaintiffs, in order to deter them from such wrongful conduct in the future.

96. As a direct and proximate result of the illicit agreement referenced above, Plaintiffs' rights were violated and they suffered substantial and irreparable harm.

**WHEREFORE**, Plaintiffs demand a trial by jury of 12 persons and judgment in their favor on all of their claims and relief as follows:

    A. Permanent injunctive relief including but not limited to an order that Plaintiffs be reinstated, that all negative material related to the events at issue in this case be expunged from all COD records, and that a written, public apology be issued acknowledging Defendants' wrongful conduct;

    B. Back wages and benefits lost;

    C. Front pay and benefits lost;

    D. Loss of earning capacity;

    E. Compensatory damages in an amount to be determined;

    F. Punitive damages in an amount to be determined;

    G. Plaintiffs' reasonable attorneys' fees and costs incurred in bringing this action; and

    H. Such other relief as the Court may deem just and proper.

Respectfully submitted,

By: s/ Shelly B. Kulwin
One of the Attorneys for Plaintiffs

Shelly B. Kulwin
Jeffrey R. Kulwin
Julie D. Yeagle
Kulwin, Masciopinto & Kulwin, LLP
161 North Clark Street, Suite 2500
Chicago, Illinois 60601
T: 312-641-0300

By: s/ Peter S. Lubin
One of the Attorneys for Plaintiffs

Peter S. Lubin
Patrick D. Austermuehle
DiTommaso-Lubin P.C.
The Oak Brook Terrace Atrium 17W220
22d Street, Suite 200
Oak Brook Terrace, IL 60181
T: 630-333-0000